**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                )
ABIGAIL ELIZABETH SHISSLAK,      )
                                )
                Plaintiff,       )
                                )         Civil Action
v.                               )         No. 19-10768-PBS
                                )
ANDREW M. SAUL,                  )
Commissioner of Social           )
Security Administration,[1]      )
                                )
                Defendant.       )
_____  )
```

### MEMORANDUM AND ORDER

February 7, 2020

Saris, D.J.

### Introduction

Plaintiff Abigail Elizabeth Shisslak brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of a final decision denying her applications for Supplemental Security Income and Children's Insurance Benefits. She claims that the Administrative Law Judge ("ALJ") erred by failing to accord proper weight to the opinion of her primary treating physician, failing to fully consider the vocational expert's testimony, and improperly disregarding Plaintiff's testimony.

---

[1] Andrew M. Saul has been substituted pursuant to Fed. R. Civ. P. 25(d) for Nancy A. Berryhill, the former Acting Commissioner of the Social Security Administration.

For the following reasons, the Court **DENIES** Plaintiff's motion for an order reversing the decision of the Commissioner (Docket No. 9) and **ALLOWS** Defendant's motion for an order affirming the Commissioner's decision (Docket No. 15).

## Factual Background

The following facts are taken from the administrative record.

### I.   Education and Occupational History

Plaintiff was 20 years old when she filed for Supplemental Security Income and Child Insurance Benefits in 2016, alleging disability as of January 1, 2016.

She finished high school but did not complete any type of vocational training. Plaintiff has previously worked at two stores. As a salesclerk at a frozen yogurt store, she stood 6-8 hour a day serving customers. She also often lifted product containers from the storage area to refill product stocks. Later, she worked on the sales staff at a toy store supervising 2-3 people. The job required her to sit 8-9 hours a day and to occasionally walk, stand, kneel, and crouch.

### II.  Medical History

Plaintiff stated that she suffered "a lot of pain while growing up," which her pediatrician referred to as growing pains. R. 373. She also reported poor muscle mass and chronic fatigue since childhood. Symptoms became more severe in her mid-

teens. In 2014, when she was eighteen years old, she began seeking treatment for many symptoms including memory issues, narcolepsy, migraines, blurry vision, spine issues, and muscle weakness and numbness.

From April 12, 2013 to November 21, 2016, Plaintiff was seen by a clinical social worker, June Atkind, LICSW for a psychiatric disorder. R. 369. Based on Atkind's report produced on November 23, 2016, Plaintiff was diagnosed with an unspecific Adjustment Disorder, Ehlers-Danlos Syndrome ("EDS"),[2] and attention and memory issues. Id. However, the social worker did not provide any treatment record. R. 369-71.

Due to her sleep-related issues, Plaintiff participated in a sleep study on April 10 and 11, 2014. The results of her polysomnography, an all-night sleep study, were normal. However, the results of her multiple sleep latency test, or "daytime nap study," showed "narcolepsy without cataplexy."[3]

On January 31, 2015, Plaintiff met with neurologist Dr. Allan Ropper for a polysymptomatic illness and a number of unclear, tentative diagnoses. Among others, she reported she had been diagnosed with EDS for her connective tissue disorder.

---

[2] EDS is a group of hereditary disorders that affect connective tissues and are generally characterized by joint hypermobility (overly flexible joints) and stretchy, fragile skin.
[3] Cataplexy is a condition involving abrupt attacks of muscular weakness triggered by an emotional stimulus such as happiness, anger, fear, or surprise.

However, Dr. Ropper could not provide a certain diagnosis, noting that "no genetic affirmation" or other traits except for hypermobility of joints would suggest an EDS diagnosis. R. 348.

On February 12, 2015, Plaintiff was seen by Dr. Steven M. Vandor, her primary care physician. R. 344. She reported narcolepsy, asthma and "a very complicated and difficult medical history" revolving around EDS Type III.[4] Id. In particular, she reported many issues associated with her diagnosis of EDS, including joint hypermobility, cognitive issues, chronic joint and muscle pain, and visual issues. Dr. Vandor recommended aqua therapy and specialist evaluation. A medical report dated June 19, 2015 revealed that Dr. Vandor did not have a clear etiology for Plaintiff's chronic history of joint pains and was waiting for her genetic testing results to confirm the diagnosis. He also noted that Plaintiff experienced headaches that appeared "migrainous in nature." R. 343.

On July 30, 2015, Dr. Michael Erkkinen conducted a neurologic consultation to evaluate Plaintiff's "multiple complaints," including headaches, chronic fatigue and paresthesia (an abnormal sensation of the skin). R. 353.

---

[4] EDS Type III, now known as "hypermobile EDS," is mainly characterized by hypermobility in both large and small joints, leading to frequent dislocation and subluxation (partial dislocation) of joints. Unlike the other twelve subtypes of EDS, the genetic basis for EDS III is unknown.

Physical examination revealed no abnormalities except for "very mild hyperextensibility at Plaintiff's wrists and hands." R. 356. Dr. Erkkinen also opined that Plaintiff's headaches sounded migrainous. R. 357. He was "suspicious" of the EDS diagnosis "particularly given her largely unrevealing genetic screen." Id. With regard to Plaintiff's cognitive and psychological functioning given her complaints concerning memory issues and episodes of sleepiness, Dr. Erkkinen suggested a formal neuropsychologic evaluation.

Plaintiff met again with Dr. Vandor for headaches on September 11, 2015. She reported "some mild fatigue" but no concerning symptoms. R. 342. Dr. Vandor suggested continuing the use of amitriptyline, an antidepressant used to treat migraines, as "[s]he has had a good response with resolution of headache symptoms" on the medication. Id. He also noted her "chronic joint pains." Id.

On October 2, 2015, Dr. Neal K. Lakdawala evaluated Plaintiff in the cardiovascular genetics clinic at Brigham and Women's Hospital. He noted she had undergone comprehensive genetic testing for connective tissue disease, which identified a variant of uncertain significance in the gene MYH11. Although Plaintiff reported ongoing symptoms of joint pains and fatigue, Dr. Lakdawala found she had an "ambiguous cardiac phenotype" at worst. R. 358-59. He stated her genetic testing failed to

identify genes associated with the genetic connective tissue disorders Marfan, Loeys Dietz, or the vascular type of EDS, and further noted her most prominent symptoms were likely related to the abnormal relaxation and contraction of her blood vessels.

From October 25 to 26, 2015, Plaintiff was hospitalized at St. Elizabeth Medical Centre for a sudden onset of back pain. However, a chest x-ray and a magnetic resonance imaging (MRI) report showed no abnormal results.

On April 14, 2016, Plaintiff met again with Dr. Erkkinen. Plaintiff reported difficulties with organization and memory and attributed such difficulties to EDS. After examination, Dr. Erkkinen was not overly concerned about her memory problems. Dr. Erkkinen further stated that he was not convinced of her EDS diagnosis and concerned at "how strongly she anchor[ed] to this diagnosis and justifie[d] her medical issues to [it]." R. 362. However, he did note "hyperextensible joints notably at her wrister, lesser extent at the elbow." R. 361.

On April 21 and April 27, 2016, Plaintiff underwent a neuropsychological examination with Dr. Lindsay Barker with regard to her executive function difficulties. She was evaluated over two sessions because fatigue became an issue during the testing. Testing results showed "significant variability among her cognitive abilities with both notable areas of strength and significant areas of weakness." R. 403. Plaintiff showed strong

overall intellectual abilities with mild deficits primarily in the realms of attention, executive function and processing speed, which impacted her ability to learn and remember less structured verbal information.

Plaintiff was seen by Dr. Vandor on May 26, 2016 for follow-up after her recent neuropsychological testing report, which recommended the use of stimulant medication to help with her cognitive issues. Both Plaintiff and Dr. Vandor agreed that stimulants were not necessary given that she was "not struggling greatly." R. 340. She also complained of back strain. Dr. Vandor noticed no symptoms other than some tenderness around the T6 level, just below the shoulder blades, and prescribed muscle relaxants.

On July 28, 2016, Plaintiff met with Dr. Suzanne Saindon to discuss fatigue. Plaintiff reported no abnormal symptoms. She thought she was appropriately tired "considering her hectic schedule getting ready for her upcoming pageant." R. 338. A physical examination returned regular results except for a mildly elevated heart rate. Dr. Saindon advised Plaintiff to increase hydration and make more nutritious meal choices.

On July 29, 2016, Dr. Gregory Piazza evaluated Plaintiff in Vascular Medicine Clinic at Brigham and Women's Hospital for dyspnea (shortness of breath). He found no symptoms out of the ordinary.

Dr. Vandor evaluated Plaintiff on September 14, 2016 for a follow-up regarding her headaches. Plaintiff stated that her headaches were light and sound sensitive. She had been taking her amitriptyline regularly at 10 mg. Dr. Vandor increased the dose of amitriptyline to 20 mg for a week or two.

On September 29, 2016, Dr. Timothy R. Smith, a neurosurgeon, examined Plaintiff in response to her complaints of neck and back pain. Plaintiff reported that she had dislocated her T5 vertebral body, located roughly halfway down the back, and experienced back pain after lifting a ball at home. However, she had no pain in her neck or back during the examination. The examination showed Plaintiff had full strength in her upper and lower extremities and intact sensation and reflexes. Dr. Smith found no problems with her neck or back.

On September 15, 2017, Plaintiff visited Dr. Vandor, reporting joint pains, increased headaches, and a recent problem with flushing and itchiness that appeared random at times. Dr. Vandor wanted to refer her for further evaluation for mast cell activation syndrome, a type of immunological disorder. Plaintiff asked to restart aqua therapy, which Dr. Vandor prescribed.

Dr. Erkkinen evaluated Plaintiff on January 4, 2018 to specially address her sleep and cognitive concerns. Dr. Erkkinen noted that Plaintiff was not working then, mostly due to her fatigue, but also because she could not stand for more than ten

minutes without experiencing pain. As to Plaintiff's sleep disorder, Dr. Erkkinen further noted she did not follow up with a repeat study despite conflicting results of the sleep studies because she did not "want to lose the diagnosis." R. 444. In terms of Plaintiff's cognitive concerns, Dr. Erkkinen found little evidence to support memory storage loss, aphasia (loss of ability to understand or express speech) or visuospatial dysfunction. He thought her sleep disorder contributed to her cognitive complaints and had "very little suspicion for degenerative or structural causes." R. 450. He recommended taking sleep medicine, attending counselling, exercising regularly, consuming a heart healthy diet, and engaging in social and intellectually stimulating activities.

On January 16, 2018, referred by Dr. Erkkinen, Plaintiff started physical therapy for functional strengthening. On intake, Plaintiff reported her pain was 1-2 out of 10 at that time and, at its worst, was 4-5. She attended eleven physical therapy sessions within two months. She demonstrated good gains in overall strength and function.

Plaintiff visited Dr. Rohit Budhiraja on January 22, 2018 for her ongoing fatigue, hypersomnia, and narcolepsy. Plaintiff complained about difficulty initiating and maintaining sleep, as well as daytime tiredness. Dr. Budhiraja reviewed previous sleep tests for her past diagnosis of narcolepsy and found they were

inconclusive. He believed Plaintiff had delayed sleep phase syndrome and inadequate sleep hygiene. He recommended cognitive behavioral therapy and changes to Plaintiff's sleep routine.

On January 29, 2018, Plaintiff met with Dr. Vandor for a urinary tract infection. She had begun feeling symptoms five days before but felt better after consuming a lot of water and taking Pyridium. She did not report back pain or fever. Dr. Vandor found Plaintiff's urine dipstick testing result was "essentially normal." R. 431.

### III. Medical Opinions

### 1. Dr. Vandor's Opinion

As Plaintiff's treating primary care physician, Dr. Vandor completed a Medical Source Statement on March 30, 2018. He identified Plaintiff's diagnoses as EDS Type III, narcolepsy, and postural orthostatic tachycardia syndrome ("POTS")[5]. He identified that based on clinical findings Plaintiff had "tender joints on exam." R. 518. He also noted she had symptoms including chronic fatigue, multiple joint pain, and partial dislocation of joints.

In terms of Plaintiff's limitations, he opined that Plaintiff could not sit for more than 15 minutes and could not

---

[5] POTS is a condition that affects blood flow and is primarily characterized by lightheadedness, fainting, and an uncomfortable, rapid increase in heartbeat.

stand for more than 5 minutes at one time. He further stated she could sit, stand, and walk for less than 2 hours in an 8-hour workday. He also noted she could not lift any weight and would be absent more than four days of work per month. Dr. Vandor concluded that Plaintiff would not be able to perform even "low stress" jobs. R. 519.

## 2. State Agency Consulting Medical Opinions

When Plaintiff initially sought disability benefits in 2016, Dr. Paula Cioffi, an advising physician to the Disability Determination Services, provided an opinion based on Plaintiff's medical records regarding her residual functional capacity. Dr. Cioffi recognized Plaintiff's "complex medical history," but opined that Plaintiff's diagnoses of EDS and narcolepsy were not definitive. R. 83. Dr. Cioffi also thought Plaintiff would be able to work at a light exertion level while avoiding concentrated exposure to extreme cold and heat, noise, vibrations, fumes, odors, dusts, gases, and hazards, and that Plaintiff would be able to occasionally lift 20 pounds, sit, stand, and walk for about six hours in an eight-hour workday, frequently balance, stoop, kneel, crouch, and crawl, and occasionally climb ramps and stairs. On June 5, 2017, Dr. Elaine Hom, a state agency medical consultant, endorsed Dr. Cioffi's opinion.

Referred by the Disability Determination Services, Dr. Dean Levy conducted a brief in-person assessment of Plaintiff on January 24, 2017. He reviewed Dr. Vandor's February 12, 2015 report and evaluated Plaintiff. Plaintiff reported chronic fatigue and chronic pain. According to Plaintiff, her pain which was particularly acute during cold weather, which could make her lose mobility in all her limbs. She also reported frequent dislocations of her knees, hips, and shoulders. Plaintiff further claimed that she suffered from migraine headaches everyday when she did not take her medication. However, taking amitriptyline reduced the frequency of her headaches to approximately once per week. Plaintiff said she was also diagnosed with and treated for asthma.

As to her daily routine, Plaintiff shared with Dr. Levy that she spent a couple of hours per day online moderating video games and saw her boyfriend two or three times a week. During the meeting, Dr. Levey found Plaintiff "well-oriented," "most cooperative" and "highly motivated." R. 373, 375. Like Dr. Barker, Dr. Levy also found Plaintiff had both areas of "relative strengths" and "relative weakness" in her cognitive functioning. R. 375.

On February 6, 2017, Dr. Jane Metcalf, an advising psychologist to the Disability Determination Services, assessed that due to her neurocognitive disorders, Plaintiff would have

no limitation in interacting with others and would have mild limitations in understanding, remembering and applying information; concentrating, persisting and maintaining pace; and adapting or managing oneself. On June 1, 2017, Dr. John Burke, an advising psychologist to the Disability Determination Services, agreed with the assessment of Dr. Metcalf when Plaintiff filed for reconsideration.

### Procedural History

Plaintiff first filed an application for Supplemental Security Income payments on September 7, 2016 alleging disability as of January 1, 2016. On October 19, 2016, Plaintiff applied for Children's Insurance Benefits on her deceased father's earning record. The applications were denied initially on February 7, 2017, and then again after reconsideration on June 5, 2017.

On April 10, 2018, a hearing was held before the Honorable Stephen C. Fulton, an ALJ, in Boston, Massachusetts. Plaintiff appeared and testified at the hearing accompanied by her counsel Kathleen L. Kane. A vocational expert, James Sarno, also testified at the hearing.

At the hearing, Plaintiff testified that she was diagnosed with narcolepsy without cataplexy, EDS Type III, and POTS. She further stated that her genetic testing revealed a gene mutation called MYH11, which "is an aneurysm risk." R. 42. She described

her "most primary symptoms" as "severe pain and fatigue." R. 42.
She said she felt severe pain all over her body and experienced
cognitive issues such as "brain fog, digestion problems, skin
problems, and neurological problems." R. 42-43. According to
Plaintiff, she could dislocate her joints on a daily basis
because of the hypermobility caused by her EDS. In the most
severe cases, she partially dislocated vertebrae twice, causing
the worst pain she had ever felt. She also testified that
fatigue and migraines made it difficult for her to perform even
the most basic tasks, such as getting up. Because of these
symptoms, Plaintiff stated, she was unable to stand for more
than five minutes or to sit properly.

Plaintiff testified that she had fainting episodes and
irritable bowel syndrome because of her POTS. She reported that
she had pectus excavatum, or sunken chest, and asthma, which
together restricted her lung capacity to about 59%. As a result,
Plaintiff could not walk for more than a block at a time.

Plaintiff also testified about her narcolepsy and severe
insomnia. She testified that due to her narcolepsy, she would
never be able to drive safely. She admitted that her narcolepsy
diagnoses were conflicting, with both positive and inconclusive
ones, but attributed the inconclusive result to defects in the
study – which was conducted at a children's hospital – namely,
that she "was in a bed that was too small, which inflamed and

aggravated [her] joints" and that the monitoring devices were the wrong size for a woman of her age. R. 47.

Regarding her cognitive issues, Plaintiff reported that it took her longer to process information due to her brain fog, making complicated tasks very difficult for her. She also had trouble maintaining attention and concentration. Plaintiff also testified that her last attempt at employment was working "in a supervisor position" at a toy store for a few months. R. 38-39. She worked "around ten hours a day", "[t]hree days a week" there. Id.

A vocational expert, James Sarno, also testified at the hearing about Plaintiff's work ability. He testified that an individual with Plaintiff's age, education, work experience and with the abilities Dr. Cioffi and Dr. Hom ascribed to Plaintiff could work as a gate attendant, a parking cashier, or a furniture rental clerk. Plaintiff's counsel then asked whether an individual with Plaintiff's age, education and work experiences could perform jobs in the regional and national economy on a full-time bases if she "could occasionally lift ten pounds," "could stand for walk for five minutes at one time," "could sit for . . . 30 minutes at one time," "could less than occasionally climb, kneel, crouch or crawl," "would need to avoid concentrated exposure to extreme cold, extreme heat, vibrations . . . fumes, odors, dusts,[]gases, and hazards," and

"would likely be absent from work three or more days per mouth."
R. 56. Those restrictions were based on Dr. Vandor's opinion as
to Plaintiff's limitations. The Vocational Expert responded that
no full-time jobs in the national or regional economy were
available for someone with those restrictions.

On July 5, 2018, the ALJ issued an opinion denying
Plaintiff's claim. In his decision, the ALJ found that Plaintiff
had not engaged in substantial gainful activity since April 1,
2016 at step one of the five-step disability evaluation process.
At step two, he found she had severe impairments of EDS Type
III, insomnia with daytime fatigue, and mild asthma. He found
the remaining conditions in the record — including narcolepsy,
POTS, and headaches — "do not present significant interference
with the ability to perform basic work activities and are not
severe impairments." R. 16. At step three, he found that
Plaintiff's impairments did not meet or medically equal the
severity of one of the listed impairments in 20 C.F.R. § 404. At
step four, he found that Plaintiff had no relevant work
experience. He determined at step five that Plaintiff retained
residual functional capacity to perform light work as defined in
20 C.F.R. §§ 404. 1567(b) and 416.967(b). As a result, he found
Plaintiff was not disabled and denied her claim.

In considering Plaintiff's alleged symptoms, the ALJ
accorded great weight to the assessments of the state agency

medical physicians because he found those assessments were consistent with the record as a whole. He gave less weight to the opinion of Dr. Vandor, Plaintiff's primary care physician, because it was neither supported by nor consistent with either Dr. Vandor's treatment notes or the other evidence in the record. The ALJ found there was no consensus that Plaintiff actually had EDS or narcolepsy. He said: "The record does not establish more than hyperextensibility." R. 24. He also pointed out that despite Plaintiff's claim that she was so extremely limited that she could only sleep or stay in bed most of the day on a normal day, she participated in a pageant, traveled to Missouri and played video games. He also noted Plaintiff "d[id] not take pain medication or participate in pain management" in spite of her claims of debilitating pain. R. 24.

On February 21, 2019, the Appeals Council denied Plaintiff's request for administrative review, rendering the ALJ's decision final and ripe for judicial review under 42 U.S.C. §§ 405(g) and 1383(c).

## **Legal Standard**

Under the Social Security Act, a claimant is entitled to disabled child's insurance benefits if he or she is "18 years old or older and ha[s] a disability that began before [he or she] became 22 years old." 20 C.F.R. § 404.350(a)(5). "Disability" is the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Bowen v. Yuckert, 482 U.S. 137, 140 (1987) (quoting 42 U.S.C. § 423(d)(1)(A)). Such impairment must be severe enough to prevent the claimant from performing not only previous work, but also "any other substantial gainful work in the national economy." Id. at 138 (quoting 42 U.S.C. § 423 (d)(2)(A)).

The ALJ uses a five-step sequential evaluation process to assess whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R §§ 404.1520(a)(4), 416.920(a)(4). These five steps are as follows:

> 1) If the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the claimant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, the application is denied; and 5)if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Purdy v. Berryhill, 887 F.3d 7, 10 (1st Cir. 2018) (quotation omitted). A claimant's residual functional capacity is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R §§ 404.1545 (a)(1), 416.945(a)(1).

The claimant "has the burden of production and proof at the first four steps of the process," and the burden then shifts to the Government at step five to "com[e] forward with evidence of specific jobs in the national economy that the [claimant] can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

## Standard of Review

Under the Social Security Act, this Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Seavey, 276 F.3d at 8 (quoting 42 U.S.C. § 405(g)). This Court must determine whether the agency's decision "is supported by substantial evidence and whether the correct legal standard was used." Id. at 9.

The substantial evidence standard is "not high" and requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "[T]hough certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy, 887 F.3d at 13 (quoting Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003)). "In applying the 'substantial

evidence' standard, the Court must bear in mind that it is the province of the ALJ, not the Court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts in the evidence." Johnson v. Colvin, 204 F. Supp. 3d 396, 407 (D. Mass. 2016).

"Questions of law," on the other hand, "are reviewed de novo." Seavey, 276 F.3d at 9. "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996). An error of law by the ALJ ordinarily requires remand, unless remand would be "an empty exercise." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).

## Discussion

Plaintiff argues this Court should reverse the Commissioner's denial of disability benefits based on three errors by the ALJ: 1) the ALJ's failure to accord proper weight to the opinion of Dr. Vandor, Plaintiff's primary care physician; 2) his failure to fully discuss and consider the vocational expert's testimony; and 3) the ALJ's improper discounting of Plaintiff's testimony. The Court addresses each argument in turn.

## I. The ALJ Accorded Proper Weight to the Treating Source Medical Opinion

Plaintiff contends that the ALJ failed to offer "good cause" for giving less weight to the opinion of Dr. Vandor, who is a treating source. Under 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), a "treating source" is an "acceptable medical source who provides [a claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." The record shows that for a period of approximately three years since February 2015, Dr. Vandor saw Plaintiff at multiple appointments and was Plaintiff's primary treating physician.

Here, Plaintiff applied for benefits prior to March 27, 2017, when the Social Security Administration's rule altering the standard for evaluating treating source opinions became effective. 82 Fed. Reg. 5, 844 (Jan. 18, 2017). Therefore, the treating physician rule should apply. Under that rule, "[c]ontrolling weight" must be given "to a treating physician's opinion on the nature and severity of a claimant's impairments" as long as the opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the record." Johnson, 204 F. Supp. 3d at 409 (quoting 20 C.F.R. § 404. 1527(c)(2)).

However, the ALJ may decline to treat the treating physician's opinion as controlling and assign it less weight if the opinion "is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians." Id. An ALJ must provide "good reasons" for the weight assigned to "the treating source's opinion." Id.; see also 20 C.F.R. § 404. 1527(c)(2) ("We will always give good reasons . . . for the weight we give your treating source's medical opinion."). Factors considered by the ALJ in determining the weight given to a medical opinion include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole." Bourinot v. Colvin, 95 F. Supp. 3d 161, 176 (D. Mass. 2015) (quoting 20 C.F.R. § 404. 1527(c)(2)-(6)).

I conclude the record contains substantial evidence to support the ALJ's decision to give less weight to Dr. Vandor's opinion regarding the severity of Plaintiff's conditions.

A. Ehlers-Danlos Syndrome Type III

Plaintiff and Dr. Vandor attributed many of Plaintiff's symptoms and limitations to EDS. However, as the ALJ pointed out, neither the primary care physician's own treating notes nor

other evidence in the record support "the dramatic limitations" described by Dr. Vandor. R. 24.

Defendant points to the lack of consensus on Plaintiff's EDS diagnosis, noting that none of Plaintiff's genetic testing confirmed her diagnosis. Defendant notes that Dr. Vandor himself found Plaintiff's medical history revolving around the EDS diagnosis "very complicated and difficult" and was "awaiting the results of her genetic testing to confirm whether [she had EDS]." R. 343-44. Similarly, Dr. Ropper found "no genetic affirmation." R. 358. Dr. Ekkinen, the treating neurologist, also expressed his suspicion of the diagnosis "given her largely unrevealing genetic screen." R. 357, 362. But Defendant's emphasis on these findings is misplaced. Plaintiff's genetic results are not surprising given that, to date, EDS Type III has no known genetic markers.

In any case, the ALJ accepted Plaintiff's EDS Type III diagnosis as a "severe impairment" but found that the record did not support the "the dramatic limitations" described by Dr. Vandor as attributable to the condition. Substantial evidence supports that finding. Significantly, Dr. Vandor's own treating notes reflect none of the significant limitations he indicated may result from EDS. Dr. Vandor wrote in his Medical Source Statement that Plaintiff could not sit for more than 15 minutes at one time, stand for more than 5 minutes, or lift or carry any

weight. He cited "tender points on exam" as the clinical findings and objective signs supporting the opinion. R. 518. However, only once in his treating notes did he find "some tenderness around the T6 level" while "[t]he back appear[ed] without gross arthritic deformity." R. 340. Notably, Dr. Vandor last saw Plaintiff on January 29, 2018 before he compiled his opinion, noting she "d[id] not have back pain." R. 430.

As the ALJ noted, other evidence also disputed Dr. Vandor's opinion regarding Plaintiff's limitations resulting from EDS. For example, notwithstanding Dr. Vandor's claim that Plaintiff was unable to lift any weight, when Plaintiff visited Dr. Smith for a "dislocated T5 vertebral body," the examination showed that Plaintiff retained "full strength" throughout her upper and lower extremities including triceps, wrist extensors and quadriceps. R. 365, 367. Moreover, while Plaintiff was attending physical therapy sessions from January 16, 2018 to March 9, 2018, her reported pain level was generally 2 out of 10. She was also "demonstrating good gains in overall strength which [wa]s translating to overall better function." R. 516.

B. Sleep Disorder

In Dr. Vandor's opinion, Plaintiff was diagnosed with narcolepsy, which contributed to her limitations. However, that diagnosis was inconclusive and the ALJ determined it was therefore not a "severe impairment." This finding is supported

by the record. A sleep study returned "unremarkable" results, with "no abnormalities" observed. R. 470. Dr. Budhiraja, a sleep specialist, also questioned Plaintiff's narcolepsy diagnosis. He thought her sleep problems were caused by delayed sleep phase syndrome and inadequate sleep hygiene and suggested that she adopt good sleep habits and consider cognitive behavioral therapy. The ALJ thus had "good reason" to assign less weight to Dr. Vandor's opinion to the extent it relied on Plaintiff's uncertain narcolepsy diagnosis.

C. Migraine Headaches

Dr. Vandor's opinion was also based in part on Plaintiff's history of migraines. But his treating notes showed that Plaintiff "had a good response to [amitriptyline] with near complete resolution of her daily chronic headaches." R. 342. Plaintiff reported that the medicine reduced the frequency of migraine headaches to approximately one time a week.

Here, substantial evidence demonstrates that Dr. Vandor's opinion regarding Plaintiff's limitations is not supported by the record. Therefore, the ALJ gave good reasons for giving less weight to his opinion.

II. **The ALJ Considered Vocational Expert's Testimony Appropriately**

Plaintiff further argues the ALJ improperly discounted the vocational expert's opinion given in response to a hypothetical

question at the hearing. This argument has no merit. An opinion offered by a vocational expert in response to a hypothetical question is probative only insofar as the question "contain[s] the relevant facts." Padilla v. Barnhart, 186 Fed. Appx. 19, 21 (1st Cir. 2006) (quoting Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 131 (1st Cir. 1981)). The ALJ may disregard a vocational expert's testimony when it is "based on discredited evidence." Id. at 22.

Here, several hypothetical questions were asked and answered at the hearing. The limitations in the question posed by Plaintiff's counsel were roughly based on Dr. Vandor's opinion, including, among others, the inability to walk more than five minutes and the likely absence from work for three or more days per month. As discussed above, it was appropriate that the ALJ gave less weight to Dr. Vandor's opinion, making counsel's question less relevant to the ALJ's analysis. Therefore, the ALJ did not err in discounting the vocational expert's answer to that hypothetical question.

### III. The ALJ Credited Plaintiff's Testimony Properly

Plaintiff argues that the ALJ also improperly discounted her own testimony, particularly regarding her pain. The ALJ explained that "[t]o the extent the claimant testified to greater limitations than I have found, I find that testimony not

consistent with the treatment record and other evidence above
for the following reasons." R. 24.

In principle, "[t]he credibility determination by the ALJ"
with regard to a claimant's testimony "is entitled to deference,
especially supported by specific findings." Frustaglia v. Sec'y
of Health & Human Servs., 829 F. 2d 192, 195 (1st Cir. 1987).
But even where an ALJ fails to provide "detailed explanations"
or "express findings," a court may nonetheless decide that his
decision to discount a claimant's testimony is "supported by
substantial evidence." Id.

As to a claimant's subjective claims of pain, "an ALJ must
inquire into six 'Avery factors'" and consider them in his
judgement of the credibility of the claimant's testimony. Pires
v. Astrue, 553 F. Supp. 2d 15, 22 (D. Mass. 2008) (quoting Avery
v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir.
1986)). The six Avery factors are:

1. The nature, location, onset, duration, frequency,
   radiation, the intensity of any pain;
2. Precipitating and aggravating factors (e.g., movement,
   activity, environmental conditions);
3. Type, dosage, effectiveness, and adverse side-effects of
   any pain medication;
4. Treatment, other than medication, for relief of pain;
5. Functional restrictions; and
6. The claimant's daily activities.

Id. at 22-23.

Here, the ALJ considered evidence relating to the six Avery
factors in reaching his credibility determination. On the first

factor, Plaintiff claimed extreme limitations and described experiencing "severe pain" "daily and constantly." R. 42, 49. However, Plaintiff also reported that her pain level was 0 out of 10 at best and only 4-5 out of 10 at worst when she started her physical therapy on January 16, 2018. R. 492. Regarding the third and fourth Avery factors, the ALJ pointed out that Plaintiff "d[id] not take pain medication or participate in pain management" on a regular basis. R. 24. As to the sixth factor, the ALJ found Plaintiff's daily activities inconsistent with her testimony: "she participated in a pageant in July of 2016, traveled to Missouri in August 2017 . . . play[ed] video games as well as moderate[d] them." R. 24. Therefore, evidence from the record supports the ALJ's decision to give less weight to Plaintiff's testimony, including her claims regarding pain.

## Order

The Court **DENIES** Plaintiff's motion to reverse the decision of the Commissioner (Docket No. 9) and **ALLOWS** Defendant's motion to affirm the Commissioner's decision (Docket No. 15).


SO ORDERED.


/s/ PATTI B. SARIS.
Hon. Patti B. Saris
United States District Judge